UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MAINE

| | |
|---|---|
| ALEXIS HENDERSHOT,<br><br>       Plaintiff,<br><br>v.<br><br>VK BATH, LLC d/b/a WINSHIP GREEN CENTER FOR HEALTH & REHABILITATION, LLC,<br><br>&<br><br>NATIONAL HEALTH CARE ASSOCIATES, INC.,<br><br>       Defendants. | Docket No. |

COMPLAINT
INJUNCTIVE RELIEF REQUESTED
JURY TRIAL REQUESTED

NOW COMES Plaintiff Alexis Hendershot (hereinafter "Plaintiff" or "Ms. Hendershot"), by and through counsel, and complains against Defendants VK Bath, LLC and National Health Care Associates, Inc. (hereinafter "Defendants"), as follows:

JURISDICTION AND PARTIES

1. This action arises under the Whistleblowers' Protection Act ("MWPA"), 26 M.R.S. §§ 831 *et seq.*, as enforced through the Maine Human Rights Act ("MHRA"), 5 M.R.S. §§ 4551 *et seq.*, and the False Claims Act ("FCA"), 31 U.S.C. §§ 3729, *et seq.*

2. Ms. Hendershot is a United States citizen residing in the Town of Wiscasset, County of Lincoln, State of Maine.

3. VK Bath, LLC ("Winship Green") which does business as Winship Green Center for Health & Rehabilitation, LLC, is a limited liability corporation domiciled in the State of Maine with a place of business in the City of Bath, County of Sagadahoc.

4. National Health Care Associates, Inc. ("NHCA") is a corporation domiciled in the State of Connecticut with a business address in the Town of Wethersfield.

5. At all material times, Defendants were Ms. Hendershot's "employer" as that term is defined in the MWPA and MHRA.

6. On about August 3, 2022, Ms. Hendershot filed a timely Complaint of Discrimination against Defendants with the Maine Human Rights Commission ("MHRC").

7. On about August 7, 2023, Ms. Hendershot received "right to sue" letters from the MHRC.

8. Ms. Hendershot has exhausted her administrative remedies for the purposes of the claims set forth in this Complaint.

9. This Court has subject matter jurisdiction over Plaintiff's federal and state claims pursuant to 28 U.S.C. §§ 1331 and 1367.

## JURY TRIAL DEMAND

10. Plaintiff requests a trial by jury for all claims and issues for which a jury is permitted.

## STATEMENT OF FACTS

11. NHCA operates a post-acute network of about 39 skilled nursing and assisted living centers located throughout Connecticut, Maine, Massachusetts, New Hampshire, New York, and Vermont.

12. NHCA had more than 7,000 employees in 2022 and 2023.

13. Winship Green operates a short-term skilled and long-term care nursing facility in Bath, Maine.

14. At all material times, NHCA and Winship Green were an integrated enterprise with common ownership, common management, interrelated operations, and centralized control with regard to labor relations.

15. At all material times, NHCA and Winship Green were Ms. Hendershot's joint employers.

16. Ms. Hendershot was hired by Defendants to be a Nurse Supervisor at Winship Green in August 2016.

17. Starting in about 2018, Winship Green's Administrator was Carl Chadwick.

18. In January 2018, Ms. Hendershot moved to a different role as MDS (Minimal Data Set) Coordinator.

19. Ms. Hendershot's final rate of pay was $999 per week.

20. As the MDS Coordinator at Winship Green, Ms. Hendershot assessed patients' physical and mental status and medical needs. She compiled information to submit to the Center for Medicare and Medicaid Services (CMS), MaineCare, and private insurers to get reimbursement for patient care.

21. Ms. Hendershot worked 40 hours per week at first, then reduced her schedule to three, 10-hour shifts per week to temporarily accommodate her disability (PTSD from military service).

22. In October 2019, Ms. Hendershot's hours increased again to 40 hours per week until March 14, 2022.

23. Ms. Hendershot's job performance met and exceeded expectations.

24. Because of systems Ms. Hendershot put into place, Winship Green had the highest Case Mix Index ("CMI")[1] in the region for over a year even though it was the lowest budgeted facility.

25. Ms. Hendershot was devoted to her job.

26. In 2021/22, Ms. Hendershot completed her American Association of Post-Acute Care Nursing certification for MDS almost entirely on her own time, not during work hours as did other MDS Coordinators.

27. In 2021, Margaret Kirby became the Director of Clinical Reimbursement.

28. Ms. Hendershot reported directly to Ms. Kirby, as did about 60 other MDS Coordinators employed by Defendants.

29. Ms. Kirby issued instructions to Ms. Hendershot and other MDS Coordinators to submit false claims to CMS to obtain Medicare and Medicaid reimbursements.

30. The first time this happened to Ms. Hendershot personally was in January 2022.

31. Ms. Kirby told Ms. Hendershot to "skill" a patient, MB (that is, classify MB under Medicare Part A as in need of skilled nursing care) even though MB's physical and mental condition did not qualify for skilled nursing care. (MB did not qualify under Medicare Part A because MB had a chronic wound but it was not infected.)

32. Skilled nursing care is reimbursed by MaineCare and private insurance at a significantly higher rate than MaineCare's long term nursing care.

33. Ms. Hendershot spoke up immediately and opposed committing fraud.

34. Ms. Hendershot's opposition to the fraud was protected activity for purposes of the MWPA and the FCA.

---

[1] CMI is a measure used by MaineCare to determine the daily reimbursement rate for long term care patients.

35. Ms. Hendershot's motivation for reporting and opposing the fraud was to shed light on the issue and prevent the fraud.

36. Although Ms. Hendershot does not have access to her emails anymore, she recalls that there were probably close to 100 email exchanges between Ms. Hendershot, Mr. Chadwick, and Rebecca Sinford, Regional Director of Reimbursement for Maine, on that one patient, MB.

37. Ms. Hendershot had reasonable cause to believe that it was fraudulent to "skill" MB and she wanted to be sure to document her objections in case there was a CMS audit.

38. In her January 2022 emails to Mr. Chadwick and Ms. Sinford, Ms. Hendershot cited CMS's Resident Assessment Instrument Manual and she cut-and-pasted information from the patient's clinical documentation to explain her position.

39. On February 4, 2022, Ms. Hendershot was subjected to retaliation for objecting to and reporting concerns about Medicare/Medicaid fraud.

40. The retaliation occurred when Ms. Hendershot received a written warning for (a) disrespectful communication with regional and corporate personnel via emails exchanged on January 10, 2022, and (b) labeling a file on the facility's computer network using vulgarity (i.e., "Alexis's rando shit").

41. There was no justification to issue Ms. Hendershot a discipline with the severity of a written warning.

42. Mr. Chadwick had spoken to Ms. Hendershot about these issues on January 11, 2022. Ms. Hendershot acknowledged to Mr. Chadwick that a portion of her email exchange was unnecessary. She told Mr. Chadwick that she had forgotten about the file labeled "Alexis's rando shit". She promptly relabeled the file when it was brought to her attention.

43. Defendants have not explained why Ms. Hendershot received a written warning for these issues. In their response to the MHRC, Defendants stated that "the decision was made by Mr. Chadwick" but no rationale for the decision to issue a written warning was provided.

44. Ms. Hendershot was subjected to further retaliation on March 9, 2022, when Defendants reduced her schedule from 40 hours per week to 32 hours per week.

45. The timing of the reduction in hours is very suspicious. It happened just days after the billing change at a reduced rate went into effect for MB and Defendants were reimbursed for MB's care at a lower rate.

46. Defendants told the MHRC that the MDS Coordinator position did not require forty hours per week. This claim is not credible.

(a) After Ms. Hendershot was fired, her job was posted on Indeed as a 40-hour position.

(b) The MDS Coordinator who replaced Ms. Hendershot worked 40 hours per week.

(c) The MDS Coordinators at all other facilities in Maine except Norway (only 42 beds) work 40+ hours per week. One of the facilities has 2 MDSs. Ms. Hendershot was frequently asked to assist other facilities, specifically Augusta Rehab (72 beds) and Kennebunk (78 beds). The request for Ms. Hendershot's assistance was not for vacation coverage, but because the MDS Coordinators there were overwhelmed and needed help. Brentwood (78 beds) has a MDS Coordinator who is an LPN and not salaried. Ms. Hendershot has heard her say that she had worked 10-20 hours of overtime every single week for the last 15 years.

47. On April 28, 2022, Ms. Hendershot attended a regional meeting of MDS Coordinators.

48. Ms. Hendershot wanted to sit at the back of the room at the regional meeting because of her PTSD but Ms. Kirby directed Ms. Hendershot to sit close to the front of the room.

49. At one point during the meeting, Ms. Hendershot asked about a policy Ms. Kirby established soon after she (Ms. Kirby) came to NHCA. When Ms. Hendershot said that the policy was put out "about a year ago", Ms. Kirby responded, "Ha! It couldn't have been me. I haven't been here a year yet!"

50. At another point in the meeting, Ms. Kirby asked, "How do we all do baseline temps?"

51. Ms. Kirby was looking directly at Ms. Hendershot when she asked the question, so Ms. Hendershot responded, "We take the average of the first nine temps", which was the current policy.

52. Ms. Hendershot heard some mumbled agreements from MDS Coordinators sitting behind her.

53. Ms. Kirby told Ms. Hendershot, "Wrong. I am going to be changing that!"

54. Ms. Hendershot replied, "Well, if it has not changed yet then the policy is still the first nine temps, so right now, I'm not wrong."

55. Ms. Hendershot felt attacked. Ms. Kirby set her up to give a "wrong" answer.

56. Later in the meeting Ms. Kirby was going over some laminated Payment Driven Payment Model handouts she had made as cheat sheets.

57. Ms. Hendershot heard one of the other MDS Coordinators nearby comment about the amount of information included on the handout, and that it all looked confusing.

58. Ms. Hendershot replied to her colleague that Preferred (another company that partners with National Healthcare) had put out a great cheat sheet that she used every day and offered to email it to her colleague.

59. Ms. Kirby interrupted them and said to the whole group "I want you all to be using these handouts I gave you, nothing else, everything you need is right there".

60. Ms. Kirby continued to target Ms. Hendershot throughout the meeting.

61. Ms. Hendershot spoke up when Ms. Kirby said things that were wrong or confusing.

62. Ms. Hendershot was very upset about how Ms. Kirby treated her at the meeting on April 28, 2022.

63. The following day, Friday, April 29, 2022, Ms. Hendershot was still upset about the meeting when she went to work. A staff nurse, Lynn Owens, walked past Ms. Hendershot's office and noticed the look on her face. Ms. Owens stopped to ask what was wrong. Ms. Hendershot started telling Ms. Owens about the prior day's meeting and how she felt attacked as soon as she walked in the room.

64. While Ms. Hendershot was speaking with Ms. Owens, Dianne Bunch, the Director of Nursing, walked by and stopped to express concern to Ms. Hendershot.

65. Ms. Hendershot was crying and told Ms. Owens and Ms. Bunch about being made to sit up front, and about how Ms. Kirby singled her out and mistreated her during the meeting.

66. Mr. Chadwick was hovering around Ms. Hendershot's office door during most of this, and when Ms. Owens and Ms. Bunch were called away, he entered Ms. Hendershot's office, closed the door, and sat down.

67. Mr. Chadwick asked if Ms. Hendershot wanted to make a complaint about Ms. Kirby to Human Resources.

68. Ms. Hendershot said no because she did not think HR would take any action to stop Ms. Kirby from mistreating her.

69. When Ms. Hendershot got home from work that day (Friday, April 29, 2022), she intended to complete some work. When she tried to log on to the employer's computer network from home, she found that her remote access was not working. Ms. Hendershot started crying.

70. Ms. Hendershot sent an email at 1:06 pm on Friday, April 29, 2022 to Mr. Chadwick and Ms. Sinford with the subject line, "Am I being terminated?"

71. Ms. Hendershot was expecting further retaliation given the way Ms. Kirby mistreated her at the April 28, 2022, meeting.

72. Ms. Hendershot explained that her remote access had been taken away. She apologized to Ms. Sinford for leaving some of her work for the day undone.[2]

73. When Ms. Hendershot emailed Mr. Chadwick about access to the computer network, she had already worked a full 32-hour week. The in-person meeting on April 28, 2022, cut into the work Ms. Hendershot had hoped to complete before vacation.

74. At about 7:00 am on Monday, May 2, 2022, Ms. Hendershot texted Emily Queally, the Rehab Director, to let Ms. Queally know that her (Ms. Hendershot's) remote access was gone on Friday and that she (Ms. Hendershot) had not been able to finish the triple checks.

---

[2] The diagnosis codes for the three new patients, which involves about 30-45 minutes of work, could have been documented up to 72 hours after the patients were admitted.

75. Ms. Hendershot's scheduled vacation had started at the end of the workday on Friday, April 29, 2022. She returned from vacation on May 12, 2022.³

76. Defendants told the MHRC that Mr. Chadwick decided to fire Ms. Hendershot because of her conduct on April 28, 2022 (during the regional meeting) and her conduct on April 29, 2022 (stopping work early when her remote access did not work).

77. Defendants' claim is not plausible.

78. If true, Mr. Chadwick would have fired Ms. Hendershot on April 29, 2022, or when she returned from vacation on May 12, or May 20, or May 23, 2022.

79. Instead, when Ms. Hendershot returned on May 12, 2022, she received more instructions from Ms. Kirby to commit fraud against the federal government by "skilling" patients who tested positive for COVID during a facility-wide screening, but did not have symptoms, as qualified for skilled nursing care.

80. Ms. Hendershot reported concerns about Medicaid/Medicare fraud again to Mr. Chadwick.

81. Ms. Hendershot's report was protected activity for purposes of the MWPA and FCA.

82. Ms. Hendershot's motivation for reporting and opposing the fraud was to shed light on the issue and prevent the fraud.

83. On May 20, 2022, Mr. Chadwick sent an email to Ms. Kirby about Ms. Hendershot's concerns with her (Ms. Kirby's) instructions to "skill" COVID patients who do not show symptoms or increased needs that would warrant waiver coverage.

---

³ Ms. Hendershot was a dedicated employee. The last vacation she took was in 2019, when she had major surgery.

84. That afternoon, Mr. Chadwick sent Ms. Hendershot an email: "OK…spoke with Margaret [Kirby]. She sees where the January email may have caused some confusion but clarifies that if they have COVID, we skill under O&A for up to 10 days under the 1135 Waiver. …"

85. Ms. Hendershot replied by email to Mr. Chadwick that she would comply with Ms. Kirby's interpretation of the waiver. After Ms. Hendershot read and re-read the regulations, she emailed Mr. Chadwick again:

> "I lied; I can't do it. After researching for the last 2 hours and re-reading the waiver multiple times- until someone has a med change or shows some kind of symptoms – anything – I am not comfortable skilling…."

86. Ms. Hendershot sent Mr. Chadwick a screenshot of the regulation that supported her position.

87. Ms. Hendershot's subsequent report was protected activity for purposes of the MWPA and FCA.

88. Ms. Hendershot's motivation for reporting and opposing the fraud was to shed light on the issue and prevent the fraud.

89. On May 24, 2022, Ms. Hendershot was terminated.

90. The stated reasons for termination were (a) labeling an electronic file using vulgarity, (b) saying "f*ck" during the regional meeting of MDS Coordinators, (c) contradicting Ms. Kirby during the regional meeting by, for example, telling another MDS Coordinator that the table/spreadsheet the group was being told to use was "no good", and (d) leaving work undone on April 29, 2022.

91. The stated reasons for Ms. Hendershot's termination are untrue and pretextual:

(a) Ms. Hendershot had already been warned about the electronic file and renamed it.

11

(b) Ms. Hendershot probably did say "what the f*ck", or something similar, at the regional meeting. The word is widely used by employees and tolerated by management at Winship Green.

(c) It is true that Ms. Hendershot contradicted Ms. Kirby during the regional meeting. She was defending herself when Ms. Kirby singled her out and embarrassed her by telling her in front of her peers that she was wrong about how baseline temps were calculated, even though she was right.

(d) It is not true that Ms. Hendershot told other MDS Coordinators that the table/spreadsheet that Ms. Kirby prepared was "no good". It was another MDS Coordinator who said the handout had too much information and was confusing. All Ms. Hendershot did was offer to share a tool that she found helpful with a colleague.

(e) Ms. Hendershot did leave a small amount of work undone on April 29, 2022, when her remote access stopped working. She asked a colleague to cover for her. She was not aware that her remote access was restored soon after she reported the problem.

92. During the termination meeting, Mr. Chadwick told Ms. Hendershot that "HR was consulted, but not our HR, so there's that." Mr. Chadwick was referring to corporate HR for NHCA.

93. This evidences that the decision to terminate Ms. Hendershot was made at the corporate level in reaction to Ms. Hendershot's reported concerns about fraud and also evidences that the two Defendants are an integrated enterprise.

94. Defendants did not follow their own progressive discipline policy in Ms. Hendershot's case.

95. Defendants' Progressive Disciplinary Process states that there are five steps leading to termination.

(a) The first step is On the Job Training.

(b) The second step is Counseling.

(c) The third step is Written Warning.

(d) The fourth step is Final Written Warning or Suspension.

(e) The fifth step is Termination.

96. Defendants' policy explains that step "d" is "used to inform the employee that the next step in the disciplinary process will be termination."

97. In Ms. Hendershot's case, Defendants issued a Written Warning on February 24, 2022, even though the policy only called for first or second step levels of discipline.

98. Then, Defendants skipped over the fourth step – Final Written Warning or Suspension – which is used to put employees on notice that their job is in jeopardy – and fired Ms. Hendershot.

99. Defendants told the MHRC that "there were complaints at times from other employees about Complainant's attitude, use of language, and general commentary", but there is no documentation to support this claim and no details about which employee(s) allegedly complained or what exactly they allegedly complained about.

100. Defendants stated or implied that the Regional Director, Rebecca Sinford, needed to work on Saturday, April 30, 2022, to complete work that Ms. Hendershot did not finish before starting her vacation. This is not true. The diagnosis codes for the three new admissions could have waited until Monday, May 2, 2022. The triple checks that Ms. Hendershot was working on

were not due until noon on Monday, May 2 (for a small portion) and by noon on Thursday, May 5 (for the majority). If Ms. Sinford did, in fact, work on Saturday, April 30, it was by choice.

101.   Defendants told the MHRC that Mr. Chadwick discussed reducing Ms. Hendershot's hours of work many times with Ms. Hendershot and that she raised no concerns. This claim is inaccurate and misleading. Mr. Chadwick told Ms. Hendershot several times after the February 4, 2022, disciplinary action that he was thinking about reducing her hours; he was not asking her opinion.

102.   Ms. Hendershot engaged in protected activity when she, acting in good faith, opposed what she had reasonable cause to believe was instructions by Ms. Kirby to commit Medicaid/Medicare fraud and violations of Center for Medicare and Medicare Services (CMS) and Maine Department of Health and Human Services (DHHS) rules and regulations pertaining to participation and billing in Medicare and Medicaid (MaineCare).

103.   Ms. Hendershot engaged in protected activity in January 2022, just before she was issued a written warning.

104.   Ms. Hendershot engaged in protected activity again on May 20, 2022, just two business days before she was fired.

105.   Ms. Hendershot made her protected reports regarding fraud to oppose and shed light on the fraud and to prevent the fraud in question.

106.   Defendants submitted bills to the State of Maine Department of Health and Human Services (DHHS) seeking reimbursement for services purportedly provided by Defendants to MaineCare eligible residents.

107.   Ms. Hendershot understood that the information submitted by Defendants in connection with their MaineCare billing needed to be accurate and that providing false and/or

misleading information to the government to support a higher level of reimbursement than was justified for the services in question was unlawful fraud against the government.

108.    Ms. Hendershot believed that the paperwork that she was asked to complete in January 2022 to falsely reflect that a resident required skilled nursing care would be submitted to the government in order to fraudulently obtain reimbursement from the government for services that were not being provided.

109.    Ms. Hendershot believed that the paperwork that she was asked to complete in May 2022 to falsely reflect that residents with asymptomatic COVID required skilled nursing care would be submitted to the government in order to fraudulently obtain reimbursement from the government for services that were not being provided.

110.    Ms. Hendershot's belief that her "skilling" the residents in question in January and May 2022 would lead to fraud on the government was accurate and correct.

111.    Ms. Hendershot opposed the practice of submitting false information to the government because she believed it was illegal to defraud the government in this manner.

112.    Ms. Hendershot prevented fraud on the government by opposing the practice of submitting false information to the government in order to obtain reimbursement for services not provided.

113.    Ms. Hendershot's actions opposing fraud on the government to her employer concerned her employer's knowing submission of false and fraudulent claims of payment to the government.

114.    Ms. Hendershot's actions opposing fraud on the government could reasonably lead to an action under the FCA.

115. Ms. Hendershot's actions opposing fraud on the government were efforts to stop a violation of the FCA.

116. The reasons alleged by Defendants for firing Ms. Hendershot are pretextual.

117. The real reason for Ms. Hendershot's termination is retaliation for her opposition to Ms. Kirby's policy of committing Medicare/Medicaid fraud by coding patients as in need of skilled nursing care who were not qualified for that level of care.

118. The evidence of pretext, animus, and probative timing all support a causal connection between Ms. Hendershot's protected activity and her termination.

119. Defendants knowingly violated Plaintiff's rights with malice or reckless indifference and so are liable for punitive damages.

120. As a result of Defendants' unlawful discrimination against Ms. Hendershot, she has suffered lost wages, lost benefits, loss of enjoyment of life, loss of self-esteem, injury to reputation, injury to career, injury to education, humiliation, and other pecuniary and non-pecuniary losses.

121. Ms. Hendershot has no plain, adequate, or complete remedy at law to fully redress the wrongs alleged, and she will continue to suffer irreparable injury from her treatment by Defendants unless and until Defendants are enjoined by this court.

COUNT I: MHRA and MWPA

122. Paragraphs 1 - 121 are incorporated by reference.

123. The Maine Whistleblowers' Protection Act ("MWPA") prohibits an employer from discharging an employee because: "the employee acting in good faith . . . reports orally or in writing to the employer or a public body what the employee has reasonable cause to believe is

a violation of a law or rule adopted under the laws of this State, a political subdivision of this State or the United States." 26 M.R.S. § 833(1)(A).

124. The MHRA prohibits an employer from discharging an employee because of previous actions that are protected under the MWPA. *See* 5 M.R.S. § 4572(1)(A).

125. Defendants violated the MWPA as enforced through the MHRA when they terminated the Plaintiff for engaging in activity protected by the MWPA.

126. Defendant National Health Care Associates, Inc. aided, abetted, incited, compelled and coerced Defendant VK Bath, LLC to terminate Plaintiff in violation of 5 M.R.S. § 4553(10).

127. Defendant National Health Care Associates, Inc. unlawfully coerced, intimidated, threatened, and interfered with Plaintiff's exercise and enjoyment of her right to be free from retaliation in violation of 5 M.R.S. § 4633(2).

## COUNT II: FCA Retaliation

128. Paragraphs 1 - 127 are incorporated by reference.

129. The anti-retaliation provisions of the FCA make it unlawful to discharge, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of lawful acts done by the employee in an effort to stop a violation of the FCA.

130. Defendants' conduct violates the FCA.

## PRAYER FOR RELIEF

Wherefore, Plaintiff requests that the Court grant the following relief:

A. Enter Judgment in Plaintiff's favor;

B.	Declare Defendants' conduct to be in violation of Plaintiff's rights under the MWPA and MHRA;

C.	Enjoin Defendants, their agents, successors, employees, and those acting in concert with them from continuing to violate Plaintiff's rights;

D.	Order Defendants to employ Plaintiff or alternatively award front pay and benefits;

E.	Award lost future earnings to compensate Plaintiff for the diminution in expected earnings caused by Defendants' discrimination;

F.	Award equitable-relief for back pay, benefits and prejudgment interest;

G.	Award compensatory damages in an amount to be determined at trial;

H.	Award punitive damages in an amount to be determined at trial;

I.	Award liquidated damages in an amount to be determined at trial;

J.	Award nominal damages;

K.	Award attorneys' fees, including legal expenses, and costs;

L.	Award prejudgment interest;

M.	Permanently enjoin Defendants from engaging in any employment practice which retaliates against employees who engage in protected activity under the MHRA, MWPA, and FCA;

N.	Require that Defendants mail a letter to all employees notifying them of the verdict against it and stating that Defendants will not tolerate whistleblower retaliation in the future;

O.	Require that Defendants post a notice in all of its workplaces of the verdict and a copy of the Court's order for injunctive relief;

  P. Require that Defendants train all management level employees about the illegality of whistleblower retaliation;

  Q. Require that Defendants place a document in Plaintiff's personnel file which explains that they unlawfully terminated Plaintiff because of whistleblower retaliation; and

  R. Grant to Plaintiff such other and further relief as may be just and proper.

Dated at Portland, Maine this 13th day of October, 2023

        /s/ Chad T. Hansen
        Chad T. Hansen, Esq.
        Martin Tartre, Esq.

        Attorneys for Plaintiff
        EMPLOYEE RIGHTS GROUP
        92 Exchange Street, 2nd floor
        Portland, Maine 04101
        Tel (207) 874-0905
        Fax (207) 874-0343
        Chad@EmployeeRightsLaw.Attorney
        Martin@EmployeeRightsLaw.Attorney